I would like to reserve two minutes for rebuttal. Nancy Mageno never bought drugs, never sold drugs, never used drugs. She never had drugs, she never got drugs, she never brought drugs. All she did was translate a couple of conversations from one of her co-defendants, Jesus Burgos, who she refers to, and with the Court's permission, I'll refer to as Virio, because that's how he was referred to in the trial. Kagan I thought that wasn't, in fact, all she did. She did, in fact, for example, when somebody called him after she'd seen the person following her, she essentially, speaking in code, said that we're having trouble here and there's a problem. And so she spoke directly to somebody about that. Carvin Well, that is true, Your Honor. And my recollection is that Ms. Mageno specifically addressed that when she testified. And she testified, which is in opposite to the Court's view, that she's saying he's not here, there was some question about an aunt that was ill or something, and that's how she addressed it. I mean, it wasn't the be-all, end-all, it wasn't a conclusive or very... Kagan She also said she threw him out of the house, but then a couple of months later she went to Washington with him. Carvin Well, yes, she did throw him out of the house. She did go to Washington. And the government mentions that Yakima is a hub of drug activity. Kagan Well, that's not very informative. But still, she claimed to have cut ties with him, but she didn't. Carvin Right. Well, she did, but, I mean, it would seem to me that it had to do with, once again, a sick relative or family. And I believe in many cases, and especially in this particular Hispanic family, that family did trump all. And, in fact, they were stopped by the, I guess, by the Highway Patrol, and no drugs were found. However, I think the crux of this case is, what exactly did she know when she had these conversations? Now, obviously, one can't get in one's head to think what was going on. But, as the government conceded, there is absolutely no mention of any drugs, per se, on the telephone. And, granted, that usually does not happen. Kagan You don't suspect. You don't suspect that if they don't say drugs, there's no drugs involved. We know from many phone taps, you don't use that, you use code words. But the real issue here is that there was no motion at the end of the government, at the end of the evidence. So we have to, in order to reverse this case, find plain error. Now, it's clear that the jury saw it differently than you did as to what those words meant and what her knowledge was. So what do you have to show now to get a reversal? Well, granted, you have to show that no reasonable jury could have found the defendant guilty on the facts, no reasonable jury. Right, when taking the evidence in the light most favorable to the government. That's accurate, Your Honor. Now, it seems to me that's a long hill to come up. Tell me how you win it. Well, it is a long hill to come up. And according to the Cruz case, which was, excuse me, cited by the government, the plain error standard for insufficiency of the evidence is, and I don't want to misstate, but I think it's theoretically not, excuse me, theoretically not much more stringent than the standard for a preserved frame. And, yes, while it's a huge uphill battle, I think the huge uphill battle isn't that much different for whether it was objected to. What about the argument that the government magnanimously, and I mean that, made with regard to the mistake that everybody made at the trial with regard to the question whether she knew that there was, that he had been deported for drugs. Now, first of all, I note that you not only didn't raise the argument, but you didn't file a reply brief adopting the argument. You didn't file a reply brief at all. Am I right about that? Correct. So you've never actually adopted this argument in any form. I'm sorry, Your Honor. You haven't actually adopted this argument on behalf of your defendant in any form, even after the government raised it. Well, I did not file any written brief. That's correct, Your Honor. All right. That's peculiar, may I say. But now what do we do with it? First of all, is it a valid argument? And second of all, what do we do with the fact that you haven't raised it? Your Honor, I think it is a valid argument, and I think that the fact the government has raised it in, I forget what it says, in an abundance of candor, which I applaud, I think that because it's in the government's brief that I can address it at this time, and I would like to address it. But you didn't even stand up here now to address it. I mean, I find your whole strategy here mighty peculiar, but go ahead. If I never raised it, we still might never have heard it. Well, and in the brief, Your Honor, that was quoted by the government, I did object at sidebar at that time, and I did admit to the jury and, you know, it's my practice. If I don't know, I don't know. And I said I wasn't 100 percent sure. And I'm not saying that it's a problem that you've committed an ineffective assistance and we should wait all this out until after and let somebody raise a 2255 based on ineffective assistance, because you also said the same wrong thing? No, Your Honor. What I'm saying is that I don't think that it was ineffective for me to say to the jury I didn't remember exactly. I think it would have been – I think it would be much more ineffective if I said, I guess it's A, B, and C, when it actually was D, E, and F. And that's always been my practice. But you didn't say – I understood you to be saying not that you didn't remember exactly whether he said that he – she knew it, but you didn't remember exactly what he said about that, but you never doubted that she said – but you did represent that she knew it. No, Your Honor. I think what I said was that I don't remember the testimony was that he said, oh, she knew that I was deported, or – and I'm paraphrasing – or he said that she knew I was deported because I was trafficking drugs, because there was some colloquy at the bench about that. And it would seem that even though the judge didn't say to them, oh, I remember it like this, but based on the sidebar, the judge said he remembered it like that. And based on that, my memory – All right. Well, suppose we thought that – so everybody got it wrong. Yes. The judge got it wrong, you got it wrong, he got it wrong. And you actually did say he either said I was deported and she knew about it or she knew why I was deported. So you were only doubting the exact words. You weren't doubting that she knew. So everybody got it wrong. The question is, what do we do with that now? First of all, is it harmless error? And what kind of error is it exactly? Well, Your Honor, I don't believe it's harmless error. Even though the Court did point out those other conversations about the phone afterwards, I don't think that's the crux of this case. The crux of this case is when she was – when she was translating these conversations between Virio, her godson who lived with her, and these other unnamed people, because she didn't know who they were at that time. And she was charged as a co-defendant with nine other co-defendants. She didn't know eight of them. The only one she knew was Virio, and the reason she knew him was not because they were in some illicit scheme. It was because he was her godson. Wasn't this a conspiracy case? It's conspiracy and then distribution. She was acquitted of the distribution. So in a conspiracy case, even slightly involved are lawyers. So if she, in translating, the jury believed, knew that drugs were being involved, her connection would be sufficient because she is acting as an agent in furthering the conspiracy, correct? Yes. And then I read through all of these statements, and I'm having difficulty seeing, after reading these statements again, where I could say a reasonable jury could not find that she knew the object of that conspiracy. And I understand the Court's position. However, I believe – That's not a position. I'd like to be talked out of it. I'm just telling you, it just seems very difficult with the – with what you've got before you of the statement she made on the telephone during translation. And, Your Honor, I believe hindsight's 20-20. And in this particular case, there's no dispute that at a – and I don't remember the exact date, but at a certain time that when she saw that she was being followed, she confronted the undercover officers. Now, that's consistent with someone that doesn't have guilty knowledge, because if one had guilty knowledge and one noticed that there was an undercover vehicle, I would assume that that person wouldn't let them know. So based on that, I think we need to look at it through that lens. So at that time was the first what I will call an epiphany or an aha moment. It's like, oh, no, and then she goes back and she looks at everything. At that time, the light went on. She says, you need to get out of here. She kicked him out immediately. And she didn't even let him go back to her house to pick up any of his stuff. And, yes, there was that conversation afterwards. However, I think that's open to some dispute, and I don't think that goes to the heart of the issue. You know, it's like John Dean and the Watergate. When did she know and what she knew and when did she know it? So, I mean, at that particular time, I don't believe that there was enough evidence. And I believe that the kind of dovetails into the colloquy in the statement of the government about the whether he knew, well, she he said she knew. And then the question is, well, did she know that she was deported or did she know that he was trafficking? So there was that colloquy at that time, and I think that goes to the heart of the matter. If the Court doesn't have any more questions at this time, I'll reserve. You're over time. Thank you. Good morning. May it please the Court. Adam Flake for the United States. I just want to be clear that my magnanimity only goes so far. I raised the issue in interest of candor, and I felt like I had a duty to do so, but the argument's waived. He didn't raise it in his opening brief. He didn't really raise it on argument until prompted by the Court. I need to raise it in a reply briefing. It's waived. I'd like to just point out, if I could briefly, some really key evidence. And Mr. Yamapolsky is correct. The crux of this is when did she know what she knew. And there was disagreement between Burgos, who testified for her, and the defendant on some very vital issues in this case, one of which was she testified, I was getting suspicious. I kept asking him, what are these conversations about? And he gave me these innocuous explanations. When Burgos testified, he said, she never asked me anything about that. So there's this disagreement between her two witnesses, herself and her witness, on this really key issue of what she knew when she knew it. I mean, wasn't that just one question? Did she ask you some questions about some of the things you wanted her to translate and he said no? That was the entirety of it? Yeah. He asked, I mean, he asked a couple of follow-up questions, as I recall. But, yeah, it wasn't a, this is SCR 519. Did she ask you some questions about things you wanted to translate for her? No. She never asked you about a shipment? No. She never asked you why she was translating certain conversations? No. This after she testified. Well, neither of those things. She wouldn't ask about a shipment if she didn't understand it. And she, the fact that she had never asked why she was translating, he knew why she was translating, because he couldn't speak English. So I don't see that, any of that's terribly informative. Well, I think it is because we have her testifying. I did ask him. She said, she said that she asked about arranging the meeting, the meeting at the In-N-Out. Right. This is SCR 414 through 415. He wanted to make sure his employers met up. Asked about the shipment. He said he had to go buy some cement. Asked about the call, saying, hey, this is garbage. He was telling me they'd laid cement wrong. So I'll agree that it didn't consume a large portion of the trial record. But we have, somebody's lying here. Either he's lying, saying she didn't ask me about it. Or she's lying, saying I did ask him about it. And the jury, from that alone, could very reasonably infer, hey, they didn't get their story straight. That's the beauty of cross-examination. One of them's lying. Either she was an innocent dupe or she didn't bother to ask. Or she's just not telling the truth when she says she didn't know what was going on. And I don't think that this Court, at this point, can find that the jury was totally unreasonable when they came to the conclusion that she was lying when she said she didn't know what was going on. So that's one disagreement. The second disagreement, and I should have done a better job pointing this out in my brief, is that there's disagreement about exactly when she found out he was a drug dealer. Because she says, on the way to, remember, this is November 17th. There's surveillance being conducted. There's, Burgos tells Mejino somebody's following us. And then there's disagreement, because she says, he told me, as we got out of the car and went into the CVS, what he was up to. That's SCR 430 where she says that. Now, Burgos, when they ask him the same question, did she ask you why the car was following her? Yes. What did you tell her? That I didn't know. And then he says, I'm quoting Burgos from the record, she asked me if I knew why they were following me, and I said no, that I didn't know. And then she asked me if I was sure, and I said yes, I don't know why they're following me. And then she went and knocked on the window of the car and asked them why they were following me. He doesn't say, and then I told her I was dealing meth, and then she went and knocked on the window of the car. So it's a serious disagreement about when she knew. According to her, she knew when she went, to take a step back, she went into the CVS, she came out of the CVS and knocked on the car window. So in Burgos's words, she didn't know when she knocked on the car window that Burgos was a meth dealer. In Mojino's words, she found out as she was getting out of the car to go into the car. I mean, this all strikes me as the kind of minutia that, you know, really, I mean, you're trying to – you're using this to say that they were lying. They were lying. And I just want to point out very specifically that they were lying. One of the two of them or both of the two of them were lying on a very, very key issues in the case. When did she know what she knew? That's – Mr. Yampolsky repeatedly said that. And it matters for some reason whether she knew before she knocked on the window or after she knocked on the window? Yes, Your Honor, because they couldn't get their story straight. And the jury could – It doesn't matter. It's just that they can't – that you're saying they're lying because they're telling slightly different stories. But not because it matters whether she knew before or after she knocked on the window as to her basic point, which is she didn't know until the point that they were being followed. That's correct, Your Honor. And we can go back and try to make a coherent story for them and spin it in such a way that it doesn't matter. But the jury wasn't required to do that. The jury could look at these two conflicting stories that they're telling and rationally conclude they're lying. They didn't get their story straight. She knew all along. And I don't think at this point, under Nevels and Jackson, I don't think – I mean, it just strikes me if that's all you had, you wouldn't have much. The question is whether the content of the phone calls, and particularly the last one where – which wasn't a translation. And perhaps the fact that she was still dealing with him later is enough put together. I mean, the fact that somebody might have thought she got minor details wrong, I mean, they're minor details because they don't have anything to do with the thrust of her story. Well, Your Honor, I agree with you. That's not all of the evidence that we had. I disagree with you about whether or not they're minor details. Well, let's assume – The time that she had the knowledge was – Whatever we assume about that, on this November 17th call where she says what's happening here, and she said, I can't say over the phone. Did that occur before or after the CVS incident? After, Your Honor. So what happened was, even according to Mahino's own story, according to the story she told, I learned he was a drug dealer as I headed into CVS. I came out. I knocked on the window, asked them what they were doing. She allegedly was furious with her godson. She kicked him out of the house. And at the same time, she's taking phone calls and covering for them. And, again, it's susceptible – I mean, you could put an innocent explanation to it, or the jury could rationally conclude that she is covering for her godson. Or, I suppose, if that's all there was, you might have a mere presence sort of an argument. I mean, that is, if she didn't know until that point, and then she threw him out of the house, and he was still her godson, and somebody calls up and says, you know, what's with him? She essentially wasn't turning him over. She was trying to protect him. But I don't know if that makes her part of a drug conspiracy. And that's correct, Your Honor. And the same argument applies to the trip to Yakima two months later. It's certainly not a crime to drive in a car with a known drug dealer. We don't say that it was. But when you look at how she's behaving when she's covering for him, when she's taking a trip to Yakima, which he admitted was for the purpose of dealing drugs. Now, they both say it was to – he tricked her into thinking it was a sick relative. They got their story straight this time. They both said it was for the – he told her it was for a different purpose. But once again, this Court is not deciding guilt or innocence in this case. This Court is deciding – What about – to go back to the fact that everybody got their stories confused about the issue of whether she knew why he was deported the first time. If we were to reach that question, you argue in your brief that it was harmless. And first of all, what is prosecutorial misconduct? IAC what? Your Honor, I think I cited in my – in my brief, the Court looks at three things to determine whether it was prosecutorial misconduct, whether it was how flagrant it was, and how forthright we were at acknowledging it. And finally, if it actually affected the verdict. That's the second. What about the last question? Sorry. I'm dividing the first one into two, how flagrant it was, and second, how forthright we are about it. And third, whether or not it affected the verdict. Well, being forthright now doesn't help a whole lot if – No, I understand that. I mean, it's commendable, but it doesn't help the question of whether it was – affected the verdict. Whether it was – Affected the verdict. That's correct, Your Honor. And like I said, that evidence, it's just not there. But even excluding that improper – admittedly improper argument, mistaken as it was, even excluding that improper argument, I think the remainder of the evidence that we've discussed, the fact that she's translating these cryptic conversations, the fact that – But doesn't it take arguably ambiguous evidence and largely cancel out the ambiguity, at least make it, you know, a high percentage more likely that she couldn't have been duped by these conversations? Your Honor, I'm not contesting – I'm not claiming that it was worthless, that there was no point to bringing it up, because we did – we did bring it up. I understand. I want to know what – you are claiming it was not – I suppose it would have to be not reasonable, not – be harmless beyond a reasonable doubt if we were to look at the issue, which is another question. Your Honor, I think that we – I see that I'm out of time. I think that what the Court should do is see if the evidence is sufficient without that – without that improper argument. And it's our position that it – the jury certainly didn't act irrationally when they concluded that it was. Thank you. Thank you very much. We'll give you a minute in rebuttal. One minute. I'll be quick. Mr. Flake talked about the problems. Oh, they didn't get their story straight, they're lying or mistaken. The judge also said that anyone can make a mistake. On page 23, I won't read the whole thing. I don't have enough time. The question is, what exactly did she do? I mean, there's no question she knocked on the undercover cop's car when she came out of the CVS. Exactly what was said, there is a dispute. However, I would suggest that maybe one would lessen one's culpability when Mr. Burgos was on the stand. And also the government said get their story straight. As the Court suggested, I mean, going to Yakima, what the purpose was, that is not a minor issue. That's a major issue. And, yes, going to see a sick relative. Whether or not somebody said something on the way or exactly what was said, that would be a minor matter. On that, I'll submit it. Okay. Thank you very much. Thank you both for your argument. The case of United States v. Mayeno is submitted. We will take a short recess. And we have two cases when we return. Thank you. Thank you.
judges: Wallace, Fisher, Berzon